**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MADAKET LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-2928 (JEB)** |
| **SWEET GRACE DISTILLING COMPANY LLC,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

The settlement negotiations in this trademark case — which one might call a tale of two Surfsides — were, to borrow from Dickens, the best of times until they were the worst of times. For sixteen years, Plaintiff Madaket LLC has owned and operated Mexican restaurants here in Washington (and more recently on Nantucket) called Surfside. Defendant Sweet Grace Distilling Company LLC launched a line of canned cocktails (ask Generation Z) in 2021 that go by the same name. In an attempt to secure its beachfront intellectual property, Madaket filed suit.

The parties first pursued a settlement agreement centered on Defendant's changing the font of its logo and then, seeing a possibility for a fruitful business relationship, shifted to negotiating a sponsorship deal that would obviate the need for that original route to settlement. Then it all came crumbling down, and Plaintiff retreated to a litigation posture. Sweet Grace has now moved to enforce the terms of the first agreement — the font-change settlement — that the parties allegedly reached. Madaket, conversely, contends that no meeting of the minds ever took place. Having reviewed the relevant communications, the Court concludes that there was never

any such enforceable agreement, let alone one that persists today.  It will thus deny the Motion to Enforce the Settlement.

**I.     Background**

The parties agree about many of the facts underlying this dispute.  The background that follows takes those points of agreement as given and supplements the picture using the exhibits and declarations submitted.

Madaket owns U.S. Trademark Registration No. 4897005 for the SURFSIDE mark used in connection with restaurant and bar services.  <u>See</u> ECF Nos. 33 (Pl. Opp.) at 2; 33-1 (Declaration of Robert Blair), ¶ 5.  The mark was issued in 2016.  <u>See</u> Blair Decl., ¶ 5.  Its font (as will soon become relevant) is depicted below:



ECF No. 23-11 (Draft Settlement Agreement) at 2.

Some five years later, Sweet Grace applied for its own SURFSIDE mark for use in selling distilled spirits, which it then deployed in the branding of its new line of canned cocktails. <u>See</u> ECF No. 23-20 (Declaration of Clement Pappas), ¶¶ 5–6; 23-5 (Font-Change Agreement Emails) at 11.  The font is below:



Draft Settlement Agreement at 2.

Upon learning of this, Plaintiff sent a cease-and-desist letter, see ECF No 23-17 (Cease & Desist), but Defendant responded that it believed that the marks could coexist without creating any consumer confusion.  See ECF No 23-18 (Resp. to Cease & Desist).  Disagreeing with that assessment, Madaket filed suit in October 2023.  See ECF No. 1 (Compl.).

At the outset of the litigation, settlement appeared a likely outcome.  The parties initially converged on the idea that their marks could coexist as long as Sweet Grace modified the font used in its logo, the businesses agreed not to challenge the other's trademark validity, and each promised not to encroach on the other's business space.  See Font-Change Agreement Emails at 15–20.  By early December, Madaket had proposed ten key terms along those lines via email, and Sweet Grace had responded with revisions.  The resulting set of terms included Sweet Grace's pledge "not to open bars or restaurants," to either withdraw or amend its outstanding trademark applications with the updated font, and to "never challenge Madaket's . . . SURFSIDE trademark."  Id. at 15–17.

As for the font change at the heart of the agreement, the emails memorialized that Plaintiff "want[ed] to review and consent to Sweet Grace's revised design as part of the settlement," and that "[o]nce it [was] ready (which should be soon), [Defendant would] present Madaket with the proposed new font redesign for review and discussion."  Id. at 16.  Separately, Plaintiff conditioned its consent to Sweet Grace's refiling its trademark application on "the parties com[ing] to a mutual agreement finding the revised design . . . [not] similar to Madaket's."  Id. at 16–17.  In the cover email sending its revisions, Defendant wrote, "Assuming we are on the same page, the next step would be to discuss the font redesign."  Id. at 15.  After the parties ironed out the meaning of one term and Madaket proposed and then abandoned an

additional term, id. at 6–14, Plaintiff wrote on December 18, "I think we are in full agreement on all terms." Id. at 6.  Sweet Grace responded that same day: "Outstanding.  We will start putting together an agreement and will get you the proposed font ASAP."  ECF No. 23-3 (Font-Change Agreement Emails Cont.) at 2.

On December 19, with Defendant not yet having provided the new design, Madaket inquired "if" Sweet Grace "plan[ned] to provide images of the revised logo," and it received a response with an initial font-change proposal the next day.  See ECF No. 23-6 (Font Proposal Emails) at 5.  Plaintiff, however, rejected the mock-up out of hand, noting that it hardly looked different at all and questioning whether it was "a joke." Id. at 4.  Defendant's counsel responded with a different design proposal on December 21, but with the caveat that he "still need[ed] [his client's] buy-in on this" second graphic. Id. at 3.

Rather than respond to the latest font-change offer, Madaket switched gears entirely and set up a meeting with Sweet Grace to discuss a different business arrangement as the backbone for a broader settlement.  See ECF No. 23-7 (December Meeting Emails) at 4–5.  On December 26, the parties met and discussed a potential sponsorship deal ███████████████████ ████████████████████████████████. See Pappas Decl., ¶¶ 12–14; ECF No. 23-12 (Draft Sponsorship Agreement).  As they subsequently traded offers back and forth, Sweet Grace sent a draft agreement contemplating this alternative approach to settlement that included almost all of the terms already discussed in connection with the earlier font-change arrangement.  See ECF No. 23-10 (Business Deal Emails) at 20.  In its cover email attaching the draft, it noted that the font-change term itself had been removed "given the business deal." Id.; see also ECF No. 23-11 (Draft Settlement Agreement).

The business dealings, however, did not go down as smoothly as anticipated.  By January 24, the parties had not yet found ███████████████ .  Disappointed with the course of negotiations, Madaket wrote on that date that it would "prefer to decline entering into a sponsorship arrangement, and aim to resolve the ongoing matter by agreeing to Sweet Grace revising its logo to the previously agreed font."  Business Deal Emails at 17.  Immediately below, it included a picture of the second font proposal sent by Defendant on December 21.  Compare Font Proposal Email at 3 with ECF No. 23-8 (Business Deal Emails Cont.) at 2.  But Sweet Grace was not deterred from pursuing the sponsorship route.  It expressed a willingness to continue negotiating, which brought Plaintiff back to the table.  See Business Deal Emails at 14, 16.  Ultimately, on February 7, Madaket made a sponsorship-deal offer that Sweet Grace accepted in writing.  Id. at 10–11.

As surely as the tide goes in and out, though, the parties changed their tune yet again.  This time, Madaket pulled out of negotiations entirely on February 15, citing Sweet Grace's January 29 filing with the U.S. Patent and Trademark Office.  Id. at 8.  In that submission, Defendant had called Plaintiff's mark "inherently weak" and had argued vigorously for its right to register its own mark.  See ECF No. 23-19 (USPTO Filing) at 8.  From Madaket's vantage, this filing was a showing of bad faith given the parties' prior "good faith understanding and agreement of settlement terms," one of which was to not attack the validity of each other's marks.  See Business Deal Emails at 8.

From here, the prospect of settlement quickly slipped below the horizon.  On March 19, Madaket proposed a licensing agreement in lieu of both the font-change and sponsorship deals.  See ECF No. 23-15 (Licensing Offer Letter) at 4.  Sweet Grace rejected it, stating that the idea "could not be more far afield from what the parties already discussed and agreed to."  ECF No.

23-14 (Licensing Offer Emails) at 2.  Shortly after, Defendant filed a counterclaim against

Madaket seeking to cancel its trademark registration as fraudulently acquired.  See ECF No. 14

(Answer and Counterclaim), ¶¶ 7–33.  Sweet Grace also reports that Plaintiff disclaimed any

ongoing interest in the font-change agreement during a March 29 phone call.  See ECF No. 23-2

(Declaration of Douglas A. Rettew), ¶ 23.

Left without a willing partner in negotiations, Defendant moved to enforce the parties'

agreement.  See ECF No. 23-1 (Def. Mot.).  Which agreement exactly?  The Motion does not

attempt to enforce the sponsorship-deal version of the settlement reached on February 7, but

rather the original font-change settlement agreement discussed in December.  The Court limits its

analysis accordingly.

## II.    Legal Standard

"It is well established that federal district courts have the authority to enforce settlement

agreements entered into by the litigants in cases pending before them."  Demissie v. Starbucks

Corp. Off. & Headquarters, 118 F. Supp. 3d 29, 34 (D.D.C. 2015), aff'd, 688 F. App'x 13 (D.C.

Cir. 2017) (citation omitted).  "The moving party bears the burden of proving by clear and

convincing evidence that" such an agreement was reached.  Id.  And whether that burden has

been satisfied — that is, whether a settlement was reached — is a question of local contract law,

which here is D.C. law.  See Makins v. Dist. of Columbia, 277 F.3d 544, 547 (D.C. Cir. 2002);

Simon v. Circle Assocs., Inc., 753 A.2d 1006, 1012 (D.C. 2000) ("Generally, settlement

agreements are determined according to principles of contract law.") (citation omitted).

D.C. law provides that a settlement agreement, like any contract, is enforceable if there

was "(1) an agreement to all material terms, and (2) intention of the parties to be bound."  Duffy

v. Duffy, 881 A.2d 630, 634 (D.C. 2005).  "Which of the parties' agreement terms are material is

6

a question of fact." Demissie, 118 F. Supp. 3d at 34.  Terms crucial to informing parties "how they are expected to perform," such as "the amount to be paid and the release of liability," are generally found to be material.  Id. at 35.  As for intent to be bound, courts look to "written materials, oral expressions and the actions of the parties" as indications of the requisite intent. Duffy, 881 A.2d at 637.  A signed written agreement is the "clearest evidence of mutual assent to the terms of the document," but is not necessary to show a mutual agreement to be bound.  Id. The parties are "free to modify a contract at any time" so long as such change is supported by "mutual consent."  2301 M St. Coop. Ass'n v. Chromium LLC, 209 A.3d 82, 88 (D.C. 2019).

## III.   Analysis

To enforce the font-change agreement, Sweet Grace must establish two things: first, that an enforceable contract was formed; and second, that any such agreement was not thereafter modified.  The Court duly considers each.

### A.   Formation

Formation has two constituent parts: agreement on all material terms and intent to be bound.  Duffy, 881 A.2d at 634.  The Court need not delve into the latter, as the former presents a clear stumbling block for Sweet Grace.  It first considers where the parties stood as of December 18 — when Madaket first expressed its agreement — before turning to their subsequent communications.

#### 1.   As of December 18

Recall that on December 18, Madaket wrote in response to a Sweet Grace email providing revisions to ten core settlement terms that it believed the parties were "in full agreement on all terms."  Font-Change Agreement Emails at 6.  Defendant points to this statement as dispositive on the issues of agreement on material terms and intent to be bound, and

it argues that Plaintiff's surrounding actions — such as telling the Court that the parties had agreed on core settlement terms — were consistent with that intent.  See Def. Mot. at 19, 22.

Madaket's representations notwithstanding, Defendant cannot show that all material terms were in fact covered on December 18.  Specifically, there had been no agreement on the specific font change that Sweet Grace would make to its label.  Defendant stated twelve days earlier that working out that issue would be the parties' "next step" once they were on the same page about the agreement's scaffolding, see Font-Change Agreement Emails at 15, and it did not even propose a new font until December 20.  See Font Proposal Emails at 5.

The font-change term was not just material to the agreement; it was its linchpin.  The parties even conditioned Sweet Grace's ability to refile its trademark application on mutual agreement about the font change.  See Font-Change Agreement Emails at 16–17.  Absent further specification regarding the font, then, the agreement was akin to an employment contract that covered all the benefits but omitted the salary.  There was, accordingly, no contract formed at this stage.  See Simon, 753 A.2d at 1012 ("If the parties did not agree about [a given] material issue, then they had no agreement at all."); see also Duffy, 881 A.2d at 634.

As a fallback, Sweet Grace argues for the first time in its Reply that the parties had at least formed a "Type II" preliminary contract on December 18 — i.e., one stating agreement on certain terms and obliging the parties to negotiate in good faith on the remaining undefined ones.  See Reply at 6–7 (citing United House for Prayer for All People v. Therrien Waddell, Inc., 112 A.3d 330, 338 (D.C. 2015)).  This has some surface appeal.  Under D.C. law, "the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."  United House, 112 A.3d at 339

(citation omitted).  A Type II contract of this sort "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."  Id. (citation omitted).

Sweet Grace's creative reframing, however, does not hold water.  That is because Type II agreements typically include an explicit reference to an obligation to continue negotiations — a term missing from this would-be contract.  For instance, in Stanford Hotels Corp. v. Potomac Creek Associates, L.P., 18 A.3d 725 (D.C. 2011), the parties formed a Type II contract by agreeing to "negotiate in good faith with a view to signing a Definitive Agreement within ten (10) days after execution of this letter," which would include various already agreed-upon terms. Id. at 729.  In United House, the parties reserved the right to negotiate further terms but also agreed "to draft a written contract and accompanying schedules" modifying a prior construction bid.  See 112 A.3d at 341–42.  And in Banneker Ventures, LLC v. Graham, 798 F.3d 1119 (D.C. Cir. 2015), the term sheet in question "express[ed] the parties' 'wish to negotiate a Definitive Agreement'" and granted one party the "right to negotiate a Definitive Agreement" with the other.  Id. at 1131; see also Howard Town Ctr. Developer, LLC v. Howard Univ., 267 F. Supp. 3d 229, 240–41 (D.D.C. 2017), aff'd 730 F. App'x 1 (D.C. Cir. 2018) (finding Type II agreement where parties created schedule for execution of future agreements and provided for review and negotiation of revisions to existing terms).

The set of communications here does not fit that Type II agreement mold.  As of December 18, Plaintiff had reserved its right to "review and consent to Sweet Grace's revised design as part of the settlement," and Defendant had agreed that once the design was ready, it would "present Madaket with the proposed new font redesign for review and discussion."  Font-Change Agreement Emails at 16.  But nowhere in the parties' exchange did they commit to

further negotiations or "establish[] a general framework within which they could proceed while preserving flexibility in the face of future uncertainty" with respect to the outstanding material term. <u>Banneker Ventures</u>, 798 F.3d at 1131 (cleaned up). They merely acknowledged that additional bargaining was necessary before a contract would be in place. At most, Sweet Grace agreed to propose a design; Madaket took on no corresponding duty to consider it, much less to consider modified proposals if it found the new font unsatisfactory (as it did). The language in the parties' back-and-forth, in short, did not create an "obligation to negotiate the open issues in good faith." <u>United House</u>, 112 A.3d at 339 (citation omitted).

This conclusion is only reinforced by the parties' contemporaneous communications and later actions. Madaket asked on December 19 — after it had announced its agreement on all terms — "<u>if</u>," not <u>when</u>, it would be receiving a font-change proposal. <u>See</u> Font Proposal Emails at 5. And later in January, when the sponsorship talks had broken down, Plaintiff wrote that it would rather "aim to resolve the ongoing matter by agreeing to Sweet Grace revising its logo." <u>See</u> Business Deal Emails at 17. One does not aim at a target that has already been hit. This language thus conveys Madaket's understanding that the font-change arrangement was an open conversation, not one it was required to continue with if it decided against pursuing a sponsorship deal. In addition, Defendant never mentioned this argument until its Reply brief. Nor did it offer any evidence in the parties' communications that it believed itself bound to hammer out this final term. There was therefore no contract — Type II or otherwise — as of December 18.

### 2. After December 18

There is also no clear evidence that the parties reached final agreement on the font-change term at any point after December 18, which would have sealed the deal. Indeed, the vast

majority of their later communications revolved around the business proposal.  To be sure, Plaintiff wrote on January 24 that it no longer wanted to pursue sponsorship, but still "aim[ed] to resolve the ongoing matter by agreeing to Sweet Grace revising its logo to the <u>previously agreed font</u>."  <u>Id.</u> (emphasis added) (embedding December 21 font proposal).  Defendant holds this statement up as smoking-gun evidence that "[f]ar from being an open issue, there was nothing else to resolve" regarding the font.  <u>See</u> Def. Reply at 4.  But that email, on its own, is too small a wave for Sweet Grace to ride to shore.

To start, Madaket's statement does not conclusively establish any prior agreement to a particular font, and there is no evidence that such an agreement existed.  The statement itself, while explicitly referring to Sweet Grace's second font proposal, does not cite to any particular communication in which the parties definitively adopted it.  Madaket, moreover, denies that it ever approved the font.  <u>See</u> Pl. Opp. at 7 (citing Blair Decl., ¶ 13).  That being the case, the statement could easily be read as a tactical show at walking away from the negotiating table to induce Sweet Grace to offer ███████████████, rather than an accurate account of prior discussions.

Nor can Sweet Grace claim that the January 24 email itself was the moment that the font-change agreement crystalized into a binding contract.  As discussed, Madaket merely stated an intention to "aim" at settlement via the font-change route.  <u>See</u> Business Deal Emails at 17.  That language clearly indicates a desire to return to <u>negotiations</u> on that approach to settlement, not an intent to invoke all the terms previously deemed adequate and call it a day.  Plaintiff therefore did not assent to the font change by merely stating that it hoped to reopen that conversation.

In any event, it is not clear that Sweet Grace itself had ever internally approved the font that Madaket supposedly signed on to.  In its initial offering of the rendering, Defendant's

counsel noted that he would "still need [his] client's buy-in on" the design before moving forward with it.  See Font Proposal Emails at 3.  The Court does not see any indication in the record that such an internal rubber stamp was ever affixed to the design.  It thus cannot conclude that clear and convincing evidence shows agreement on the font change that cured the indefiniteness of the December 18 agreement.

    B.  Modification

    The Motion is also infirm for an independent reason: even if the parties had at some point formed a settlement premised on a font change, any such contract would have been modified by the sponsorship settlement agreement Sweet Grace asserts was reached on February 7.  "[A] prior contract is effectively modified by a new agreement only if the latter possesses all of the essential elements of a valid contract."  Nyhus v. Travel Mgmt. Corp., 466 F.2d 440, 445 (D.C. Cir. 1972).  "Generally, whether the contracting parties have executed a new agreement or instead modified their original agreement is a question of fact."  Hildreth Consulting Engineers, P.C. v. Larry E. Knight, Inc., 801 A.2d 967, 974 (D.C. 2002).  Contracts "leaving intact the overall nature and obligations of the original agreement" are ordinarily modifications.  Id. Whether modifications or separate contracts, moreover, agreements "containing a term inconsistent with a term of an earlier contract between the same parties, regarding the same subject matter, should be interpreted to rescind the inconsistent term in the earlier contract." Hershon v. Hellman Co., 565 A.2d 282, 284 (D.C. 1989) (citation omitted)

    As an initial matter, according to Sweet Grace's version of events, the sponsorship iteration of the settlement agreement satisfied the elements of contract formation.  Defendant itself trumpets the fact that after January 24 — the latest date on which Plaintiff displayed any interest in the font-change agreement — it entered into another agreement with Madaket.  As it

recounts, on February 7, Plaintiff offered to stock Sweet Grace's drinks in its restaurants ███

███████████████████████ and Defendant responded that they "ha[d] a deal." See Business

Deal Emails at 10–11; see also Def. Mot. at 16 (stating that "the parties entered into two . . .

agreements") (emphasis added).  Just a week later, Sweet Grace reaffirmed in an email to

Madaket that they had "already reach[ed] agreement on a business deal." See Business Deal

Emails at 7.

  Seeking to avoid the vitiating implications of this putative contract, Defendant casts it as

entirely separate from the font-change settlement. See Def. Reply at 5 ("[T]he negotiations as to

one did not affect the other.").  The Court is not convinced.  The February 7 agreement left

"intact the overall nature and obligations of the original agreement," which was first and

foremost a settlement agreement allowing for the parties' trademarks to exist alongside one

another. Hildreth, 801 A.2d at 974; see also Business Negotiation Emails at 20 (email attaching,

in Defendant's words, "the draft settlement agreement, which incorporates the core terms we've

agreed on (absent the logo change, given the business deal)") (emphasis added).  Swapping out

the font change for the sponsorship agreement thus did not fundamentally alter the contract's

"general purpose and effect" of achieving settlement such that it can be viewed as anything other

than a modification. Hildreth, 801 A.2d at 974 (citation omitted).  As set forth above, such a

modification rescinds the original agreement.

  Even if the two contracts were viewed as independent, moreover, that would not save

Sweet Grace because they are incompatible with one another.  The first settlement required a

font change, whereas the second sought to capitalize on the branding similarity between

Madaket's restaurants and Sweet Grace's drinks by selling the libations at the restaurants. See

Pl. Opp. at 2.  For that reason, when Defendant first drafted the sponsorship settlement, it took

out the font-change term, noting that the edit was made because of "the business deal."  Business Deal Emails at 20.  The formation of the sponsorship contract (which, again, Sweet Grace itself attests to) thus erased the font-change obligations attendant to any prior agreement.  See Hershon, 565 A.2d at 284 (existence of "term inconsistent with a term of an earlier contract between the same parties, regarding the same subject matter . . . rescind[s] the inconsistent term in the earlier contract.") (cleaned up).  Sweet Grace, accordingly, cannot go back in time to enforce the font-change agreement, whether because it was modified or rescinded in relevant part.

 To be clear, the Court does not conclusively find on the record before it that the parties ever entered into a sponsorship agreement.  The point here is that, on the facts Defendant itself alleges, Sweet Grace is hoisted by its own petard.

## IV. Conclusion

 For the foregoing reasons, the Court will deny the Motion to Enforce the settlement agreement.  A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 30, 2024

14